574 A.2d 1084

William and Pauline TAYLOR, Appellants,

v.

The CELOTEX CORPORATION, Eagle–Picher Industries, Inc., The Keene Corporation, Owens–Illinois, Inc. and Pittsburgh–Corning Corporation, Appellees.

William TAYLOR and Pauline Taylor, H/W, Appellees,

v.

The CELOTEX CORPORATION, Eagle–Picher Industries, Inc., The Keene Corporation, Owens–Illinois, Inc. and Pittsburgh–Corning Corporation, Appellants.

Superior Court of Pennsylvania.

Argued Aug. 16, 1989.

Filed May 7, 1990.

568

570

Suzanne Reilly, Philadelphia, for appellants (at 2592) and appellees (at 739).

Vincent D. Duke, Philadelphia, for appellants (at 739) and appellees (at 2592).

Before WIEAND, BECK and MONTGOMERY, JJ.

WIEAND, Judge:

In December, 1980, William Taylor and his wife, Pauline, residents of New Jersey, filed a civil lawsuit in the Court of Common Pleas of Philadelphia County in which they sought to recover damages for injuries allegedly suffered by Taylor as a result of long term occupational exposure to asbestos during approximately forty years of employment in the shipbuilding industry at the New York Shipyard in Camden, New Jersey, and the Philadelphia Naval Shipyard.[1]  This

---

**1.** Taylor began working in the shipbuilding industry in 1942 at the New York Shipyard.  Later in the same year, he entered the military, where he served until 1945.  Upon leaving the military, Taylor returned to the New York Shipyard in 1945 and remained there until 1952, when he went to work at the Philadelphia Naval Shipyard.  In 1953, Taylor again returned to the New York Shipyard and remained there until 1965, at which time he returned to the Philadelphia Naval

action, based on theories of negligence and strict liability, named as defendants numerous manufacturers and suppliers whose asbestos products were alleged to have caused Taylor to develop asbestosis and other related ailments. A claim for loss of consortium was also asserted on behalf of Mrs. Taylor. Prior to trial, settlements were reached with the following named defendants: Raybestos Manhattan, Inc.; Forty–Eight Insulation, Inc.; Nicolet Industries, Inc.; GAF Corp.; H.K. Porter Co., Inc. & Southern Asbestos Co.; Garlock, Inc.—Precision Seal Division; U.S. Rubber Co. & Uni–Royal, Inc.; and Owens–Corning Fiberglas Co., Inc. Additionally, Johns–Manville Corp. & Johns–Manville Sales Corp., UNARCO Industries, Inc., Pacor, Inc., and Amatex Corp., who had been named as defendants, filed for protection under Chapter Eleven of the Bankruptcy Code, and the causes of action against these defendants were stayed.[2]

Trial in this matter commenced before a jury on November 18, 1986 against the remaining defendants, who are now the appellants, Celotex Corp., Eagle–Picher Industries, Inc., Keene Corp., Owens–Illinois, Inc., and Pittsburgh–Corning Corp. The case was tried on issues of liability and damages pursuant to the substantive law of New Jersey, and this has not been challenged. On December 3, 1986, the jury returned a verdict awarding Taylor compensatory damages in the amount of eight hundred thousand ($800,000) dollars and damages for loss of consortium in the amount of one hundred thousand ($100,000) dollars. In response to specific interrogatories, the jury apportioned fault among eighteen different companies, including not only the defendant/appellants, but also defendants who had settled or gone into bankruptcy.[3] Causal fault for Taylor's illness

Shipyard. He remained at the Philadelphia Naval Shipyard until his retirement in 1984.

2. J.P. Stevens Co., Asbestos Textile Institute, Inc., and Asten Hill Manufacturing Co. were dismissed from the action when the trial court granted their motions for a summary judgment. Their dismissal is not challenged on appeal.

3. In addition to the five defendant/appellants, the eight settling defendants and the four bankrupt defendants, the jury found that Arm-

was apportioned by the jury equally among the eighteen companies at 5.5% each.

After the verdict had been returned, defendant/appellants filed a post-trial motion for judgment n.o.v. and/or a new trial, or alternatively for a remittitur. The plaintiff/appellees filed a petition for delay damages, and both sides filed motions to have the verdict molded. Thereafter, the trial court denied defendant/appellants' post-trial motions and refused to award delay damages on the ground that plaintiff/appellees' petition therefor had been untimely filed. In its post-trial opinion, the trial court, without explanation, molded the verdict to five hundred thousand ($500,000) dollars. Judgment was entered on the verdict on February 7, 1989 and defendant/appellants have appealed therefrom, raising the following issues for our review:

1. Whether the trial court erred in permitting plaintiffs' case to be decided by the jury where plaintiffs failed to prove that any specific products of defendants had caused husband-plaintiff's injuries?

2. Whether the trial court erred in admitting plaintiffs' expert testimony on state of the art issues where the proffered witness did not possess relevant expertise; where the witness's testimony rested on inadmissible hearsay; where the testimony was speculative; and where the subject of the testimony went to the ultimate issues in the case, in an area where laymen were competent to render their own judgments?

3. Whether the trial court erred in permitting plaintiffs' medical expert to testify beyond the scope of his pre-trial report?

4. Whether the trial court erred in refusing to permit defendants to elicit testimony on plaintiff's coronary disease and its impact on his symptomology from a qualified defense expert physician?

5. Whether the trial court erred in failing to order a mistrial, or, alternatively, in denying a motion for a new

strong Co., an entity which had not been sued, was also responsible for Taylor's injuries.

trial where plaintiffs' counsel addressed the jury in an inflammatory fashion, arguing facts not in the record and causes of action not before the jury?

6. Whether the trial court erred in charging the jury that it could not apportion plaintiffs' damages where there was a reasonable basis for doing so?

7. Whether the trial court erred in refusing a remittitur?

8. Whether the trial court erred in its molding of the verdict?

In addition, plaintiff/appellees have filed a cross-appeal in which they assert that "the trial court abused its discretion by dismissing a petition for delay damages filed nine days post-verdict, instead of five days as specified in *Craig v. Magee Memorial Rehabilitation Center*, 512 Pa. 60, 515 A.2d 1350 (1986)." We will address these issues seriatim.

## I

■ The first issue raised by defendant/appellants challenges the trial court's denial of their motion for judgment n.o.v. on the ground that plaintiff/appellees failed to prove that Taylor's injuries had been specifically caused by products which they manufactured. To resolve this claim, we apply the following standard of review:

> In considering the sufficiency of the evidence to sustain the verdict, we view the evidence in the light most favorable to the verdict winner, granting that party the benefit of all reasonable inferences, and determine only whether the evidence introduced at trial was sufficient to sustain the verdict. *Curran v. Stradley, Ronon, Stevens & Young*, 361 Pa.Super. 17, 24, 521 A.2d 451, 454 (1987). See also: *Laniecki v. Polish Army Veterans Assoc.*, 331 Pa.Super. 413, 417, 480 A.2d 1101, 1103 (1984).

*Cooper v. Burns*, 376 Pa.Super. 276, 280–281, 545 A.2d 935, 937 (1988). See also: *Lopa v. McGee*, 373 Pa.Super. 85, 540 A.2d 311 (1988); *Elder v. Orluck*, 334 Pa.Super. 329, 483 A.2d 474 (1984), *aff'd*, 511 Pa. 402, 515 A.2d 517 (1986).

Appellants rely on the decision of the Pennsylvania Superior Court in *Eckenrod v. GAF Corp.*, 375 Pa.Super. 187, 544 A.2d 50 (1988), in support of their contention that plaintiff/appellees failed to establish at trial that their asbestos products caused the injuries suffered by Mr. Taylor. In *Eckenrod*, the Court upheld the grant of a summary judgment against the plaintiff in a products liability action on the ground that the plaintiff had failed to present any evidence to establish that injury had been caused by the asbestos products of a particular manufacturer or supplier. The Court reasoned:

> In order for liability to attach in a products liability action, plaintiff must establish that the injuries were caused by a product of the particular manufacturer or supplier. *Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 337 A.2d 893 (1975). Additionally, in order for a plaintiff to defeat a motion for summary judgment, a plaintiff must present evidence to show that he inhaled asbestos fibers shed by the specific manufacturer's product. *Wible v. Keene Corporation*, No. 86–4451 Slip op. (E.D.Pa. August 19, 1987) [available on WESTLAW, 1987 WL 15833]; *Anastasi v. Pacor, Inc.*, No. 6251 (C.P. Phila. Co., March 8, 1983) *aff'd* 349 Pa.Super. 610, 503 A.2d 44 (1985). Therefore, a plaintiff must establish more than the presence of asbestos in the workplace; he must prove that he worked in the vicinity of the product's use. *Pongrac v. Consolidated Rail Corp.*, 632 F.Supp. 126 (E.D.Pa.1985). Summary judgment is proper when the plaintiff has failed to establish that the defendants' products were the cause of plaintiff's injury. *See Morena v. South Hills Health System*, 501 Pa. 634, 462 A.2d 680 (1983).

*Eckenrod v. GAF Corp., supra* at 190–191, 544 A.2d at 52.

In a products liability action in New Jersey, however, "[a] claimant need only demonstrate that at the time it was sold the product was defective, and that *the defect caused injury.*" *Huddell v. Levin*, 537 F.2d 726, 734 (3d Cir.1976) (emphasis added). See also: *Whitehead v. St. Joe Lead*

*Co., Inc.*, 729 F.2d 238, 246 (3d Cir.1984); *Campos v. Firestone Tire & Rubber Co.*, 98 N.J. 198, 205–210, 485 A.2d 305, 309–311 (1984); *Scanlon v. General Motors Corp.*, 65 N.J. 582, 589–591, 326 A.2d 673, 677 (1974); *Manieri v. Volkswagenwerk A.G.*, 151 N.J.Super. 422, 430–432, 376 A.2d 1317, 1322 (1977). The trial court must make the threshold determination "whether, under the circumstances, there is sufficient proof on the issues of defectiveness and causation to submit the case to the jury." *Huddell v. Levin, supra* at 734–735. We additionally observe that "the New Jersey cases manifest a policy liberally favoring jury resolution of defectiveness issues, as well as causation issues, in products liability cases." *Huddell v. Levin, supra* at 736, citing *Moraca v. Ford Motor Co.*, 66 N.J. 454, 332 A.2d 599 (1975); *Newmark v. Gimbel's Inc.*, 54 N.J. 585, 258 A.2d 697 (1969); *Cintrone v. Hertz Truck Leasing*, 45 N.J. 434, 212 A.2d 769 (1965). With regard to causes of action for negligence, New Jersey law imposes a similar requirement that the plaintiff establish that the defendant's negligent conduct was the proximate cause of the plaintiff's injuries. See: *Lamb v. Barbour*, 188 N.J.Super. 6, 11–13, 455 A.2d 1122, 1125 (1982) (proximate cause established when negligent conduct is a substantial contributing factor in causing injury). See also: *State Department of Environmental Protection v. Jersey Central Power & Light Co.*, 69 N.J. 102, 109–112, 351 A.2d 337, 341–342 (1976); *Ettin v. Ava Truck Leasing, Inc.*, 53 N.J. 463, 483–485, 251 A.2d 278, 289 (1969).

In jurisdictions where actions against manufacturers and suppliers of asbestos products are grounded upon traditional tort principles of negligence, strict liability and breach of warranty, the burden of proving causation in fact is placed on the plaintiff. See: Comment, Special Project: An Analysis of the Legal, Social and Political Issues Raised by Asbestos Litigation, 36 Vand.L.Rev. 573, 608 (1983). Therefore, courts in these jurisdictions "have refused to impose liability on a defendant product manufacturer when the plaintiff could not trace his injury to the defendant's prod-

ucts." *Id.* at 608. "To prove causation in fact, the plaintiff customarily must identify both the product that injured him and that product's manufacturer." *Id.* at 609., See: Annot., Products Liability: Necessity and Sufficiency of Identification of Defendant as Manufacturer or Seller of Product Alleged to Have Caused Injury, 51 A.L.R.3d 1344 (1973). See, e.g.: *Lohrmann v. Pittsburgh Corning Corp.,* 782 F.2d 1156 (4th Cir.1986); *Blackston v. Shook and Fletcher Insulation Co.,* 764 F.2d 1480 (11th Cir.1985); *Thompson v. Johns–Manville Sales Corp.,* 714 F.2d 581 (5th Cir.1983), *cert. denied,* 465 U.S. 1102, 104 S.Ct. 1598, 80 L.Ed.2d 129 (1984); *Richards v. Raymark Industries, Inc.,* 660 F.Supp. 599 (E.D.Pa.1987); *Starling v. Seaboard Coast Line Railroad Co.,* 533 F.Supp. 183 (S.D.Ga.1982); *Flatt v. Johns–Manville Sales Corp.,* 488 F.Supp. 836 (E.D.Tex.1980); *Case v. Fibreboard Corp.,* 743 P.2d 1062 (Okl.1987); *Ward v. Celotex Corp.,* 479 So.2d 294 (Fla.App.1985); *Wilder v. Amatex Corp.,* 314 N.C. 550, 336 S.E.2d 66 (1985).

The law in New Jersey appears to be in conformity with these authorities. Thus, in *Namm v. Charles E. Frosst & Co.,* 178 N.J.Super. 19, 427 A.2d 1121 (1981), the Superior Court of New Jersey held that a plaintiff who was seeking to recover damages resulting from the use of the drug DES was required to identify the manufacturer or distributor of the specific drug which caused injury. In *Namm,* the plaintiff had sued forty-four pharmaceutical manufacturers but was unable to identify which defendant had manufactured the product which had caused her injuries. As a result, the trial court granted summary judgment in favor of all defendants. On appeal the plaintiff argued that the burden of proving causation should be shifted to the defendants under theories of alternative liability or enterprise liability. The Superior Court of New Jersey rejected both theories of liability proffered by the plaintiff, and stated the applicable law in the following manner:

"It is a fundamental principle of products liability law that a plaintiff must prove, as an essential element of his case, that the defendant manufacturer actually made the

particular product which caused injury." *Gray v. U.S.*, 445 F.Supp. 337, 338 (S.D.Tex.1978); 1 *Hursh & Bailey, American Law of Products Liability 2d*, § 1:41 (1974); 63 *Am.Jur.2d Products Liability*, § 5 at 12 (1972); e.g., *Scanlon v. General Motors Corp.*, 65 N.J. 582, 590, 326 A.2d 673 (1974); Annotation, "Identity of Manufacturer of Defective Part," 51 A.L.R.3rd 1344, 1351.

*Namm v. Charles E. Frosst & Co., supra* 178 N.J.Super. at 27, 427 A.2d at 1125. See also: *Herber v. Johns–Manville Corp.*, 785 F.2d 79, 87 (3d Cir.1986) (plaintiff's testimony identifying defendant's logo on bag of asbestos cement was sufficient evidence to support a finding that he had been exposed to defendant's products even in the absence of express evidence relating to defendant's trademark); *Kelly v. Johns–Manville Corp.*, 590 F.Supp. 1089, 1101 (E.D.Pa. 1984) (applying New Jersey law, summary judgment granted in favor of manufacturer where plaintiff failed to produce direct evidence that he was exposed to defendant's asbestos products; plaintiff's identification of generic types of asbestos products was not sufficient to allow a jury to conclude that he had been exposed to a particular manufacturer's products); *Butler v. PPG Industries, Inc.*, 201 N.J.Super. 558, 561–563, 493 A.2d 619, 620–621 (1985) (testimony of plaintiff and a co-worker was sufficient to meet burden of proving that the caustic soda causing plaintiff's injuries had been manufactured by defendant where both identified photograph of barrel with defendant's label on it as the source of the injury causing substance).

In the instant case, plaintiff was unable to identify any of the products manufactured by appellants. He did testify, however, concerning his constant exposure to asbestos dust on the various ships and submarines on which he worked. He also testified that he worked in close proximity to various other tradesmen and specifically identified several co-workers with whom he had worked on certain ships and submarines. To establish his exposure to asbestos products which had been manufactured by appellants, plaintiff relied on the testimony of three of his co-workers at the New

York Shipyard and the Philadelphia Naval Shipyard. In its post-trial opinion, the trial court found that the plaintiff's evidence had been sufficient to allow the issue of causation to be determined by the jury. The trial court reasoned as follows:

Defendants next assignment of error is that plaintiffs failed to establish sufficient nexus between defendant's asbestos products and William Taylor. Under strict liability and negligence theories, plaintiff has the burden of showing proximate cause. Plaintiff must show that the defendant's products were a substantial factor in causing his injuries. [*David*] v. *Broadway Maintenance Corp.*, 451 F.Supp. 877 (E.D. of Pa.1978). Plaintiff must show that he was exposed to the defendant's products. *Anatan v. Pacor, Inc.*, 2651 May Term 1978 (C.C.P.Phila. 1983). Moreover, the plaintiff must show that he worked "in the vicinity" of defendants products. *Pongrac v. Consolidated Rail Corp.*, 632 F.Supp. 126 (E.D.Pa.1986).

This court notes that Mr. Taylor personally identified Johns–Manville, Owens–Corning Fiberglas, GAF and Garlock as products with which he worked. (N.T. 11/21/86, p. 45). He did not specifically identify any of the products of the five remaining defendants, Eagle Picher, Keene, Celotex, Owens–Illinois and Pittsburgh Corning Corporation as those he recalled being in his work area. However, plaintiff described working in close quarters with other tradesmen, and recalled the following co-workers; Mike Nasife, George Watts, and Tony Caparola. (N.T. 11/21/86 p. 48). He specifically recalled Nick Nasife and George Watts on the following ships with him: the "REDFIN", the "RASHER", THE ["]ROCK", and the "POM POM." (NT 11/21/86 p. 51–52).

Mr. Taylor testified that between 1965 and 1984 he went back to the Philadelphia Naval Shipyard, again working primarily on submarines. (N.T. 11/21/86, p. 50). He specifically recalled working on the "SAILFISH" in 1965. He also worked on the "SABLEFISH," the "BECUNA," the "TROUT," the "CLAMAGORE," the

"GRUMPUS," the "HARDHEAD," the "PICUK," the "TIFUROW," and the "TIGRONE." (N.T. 11/21/86 p. 50–51 and p. 69–73). Taylor specifically recalled Nick Nasife while working on the SAILFISH between 1965 and 1966 (N.T. 11/21/86 p. 51).

Though Mr. Taylor identified Johns–Manville, Owens–Corning, GAF, and Garlock, he stated that he "didn't know all of the names of the companies." (N.T. 11/21/86, p. 44) Even so, this court feels that plaintiff's testimony is relevant to the issue of product identification for Mr. Taylor identified types of asbestos products—including but not limited to asbestos, asbestos cloth, pipe covering, pipe cement, asbestos blocks, asbestos blankets and asbestos mud.

To [b]y Caparola, an electrician, testified that he worked at New York Shipbuilding in Camden from 1939–1967 and at the Philadelphia Naval Shipyard from 1967 until 1983. (NT 11/24/86 p. 5–6). Mr. Caparola testified that he worked on the "CLEVELAND," the "PRINCETON," and the "INDEPENDENCE." On those three ships, Mr. Caparola identified a cement and pipe covering manufactured by Eagle–Picher and Keene as being on those vessels. Mr. Caparola recalled working with plaintiff on those vessels during the years in question.

Nicholas Nasife worked at the Philadelphia Naval Shipyard from 1941 to 1979 as a sheet metal worker. (NT 11/24/86 p. 34). Mr. Nasife worked on the following submarines: "HALFBEAK," "SAILFISH," "CLAMAGORE," "SABLEFISH," and "TREADFISH" during the year 1965–1966. He testified that during this time he both used and was exposed to dust from asbestos products in very close quarters. (NT 11/24/86 p. 36–41) and p. 46). On the "SAILFISH" in 1[9]65 Mr. Nasife recalled the following asbestos products: Cary block Celotex Corporation (NT 11/25/86 p. 67–74): Eagle–Picher Super 60 and onecote cement; Thermasil pipe covering and block (Keene Corporation) (NT 11/25/86 p. 45); and Unibestos Pittsburgh–Corning Corporation, (NT 11/25/86, p. 18–20)

(NT 11/24/86 p. 42–41). He testified that the products that the pipe coverers used in close proximity to the electricians were also breathed by the electricians. This witness explained that he saw the products on the pier, in the shop and on the ships.

Mr. Watts testified that he worked at the Philadelphia Naval Shipyard as a pipefitter from at least 1946 to 1974. (NT 11/21/86 p. 94–95). He testified that during 1958 he worked on vessels in the Migraine program during which the following submarines were lengthened: "RAY," "REDFIN," "RASHER," "POM POM," "ROCK," and "RATON." (NT 11/24/86 p. 95). During this period of time Mr. Watts recalled using asbestos products made by Baldwin–Ehret–Hill, predecessor to Keene (NT 11/25/86, p. 38–39). Carey, predecessor to Celotex (NT 11/25/86 p. 60–69) and Kaylo, manufactured by Ownes–Illinois from 1950 to 1953 (NT 11/25/86 p. 32–33). (NT 11/24/86 P. 103). The products were used throughout the Philadelphia Naval Shipyard from 1941–1974, and were used on all the various ships.

This court holds that through the various witnesses, the evidence presented shows that the various defendant companies products were on the several ships that the plaintiff worked on. We note that the various witnesses, one or the other, not only placed the material outside or off the ship, but on the ship. This testimony related to all five defendants. Accordingly, a sufficient nexus between William Taylor's exposure to asbestos, and the products of the five remaining defendants: Eagle–Picher, Keene, Celotex, Owens–Illinois and Pittsburgh Corning Corporation has been established. This was done, if not directly, certainly circumstantially.

(Trial Court Opinion at pp. 20–23).

After carefully reviewing the record in the instant case, we are satisfied that plaintiff established a sufficient use of appellants' products to enable a jury to find that he had been exposed to asbestos products which had been manufactured by appellants. The testimony of Taylor's co-workers

established that Taylor had been on specific ships and submarines at times when appellants' products were present and that he had worked in close proximity to such products. This evidence was sufficient to meet plaintiff's burden of proving causation. Cf. *Odum v. Celotex Corp.*, 764 F.2d 1486, 1488 (11th Cir.1985) ("Testimony of co-workers who can identify a plaintiff by name as having worked with or around a particular defendant's asbestos-containing products is substantial evidence of exposure in asbestos cases."); *Richards v. Raymark Industries, Inc.*, *supra* at 601 (To avoid summary judgment, there must be evidence that plaintiff was exposed to defendant's asbestos-containing products, "either by working with them himself or by working in the vicinity of them."); *Ward v. Celotex Corp.*, *supra* at 296 (testimony by plaintiff's co-workers that plaintiff worked in vicinity where defendant's asbestos products were used raised substantial fact issue regarding causation so as to defeat motion for summary judgment).

## II

At trial, plaintiff/appellees presented video tape deposition testimony of Dr. Katharine Boucot Sturgis, a retired physician, who had practiced in the field of preventative medicine and had been a board certified internist, specializing in pulmonary diseases. Dr. Sturgis was offered by the plaintiffs as an expert on the "state of the art" to provide an opinion concerning the time when defendants should have been aware of the dangers inherent in exposure to asbestos. Based upon her review of numerous medical articles dating back to the early part of this century, along with her own experiences as a clinical physician, Dr. Sturgis opined that by 1940 the defendants should have known that asbestos had been identified by the medical community as causing asbestosis, lung cancer and other injuries. Defendant/appellants contend that this evidence should not have been received.

"The admissibility of expert testimony is a matter initially to be determined by the trial court and we will not

disturb that determination unless the trial court clearly abused its discretion." *Bolus v. United Penn Bank,* 363 Pa.Super. 247, 267, 525 A.2d 1215, 1225 (1987). See also: *Laubach v. Haigh,* 433 Pa. 487, 491, 252 A.2d 682, 683 (1969); *Kubit v. Russ,* 287 Pa.Super. 28, 34–35, 429 A.2d 703, 706 (1981). Generally, expert testimony is permitted as an aid to the jury when the subject matter of the testimony is so distinctly related to some science, skill, or occupation as to be beyond the knowledge or experience of the average layman. See: Packel and Poulin, Pennsylvania Evidence, § 702.1 (1987); *Beary v. Container General Corp.,* 368 Pa.Super. 61, 74, 533 A.2d 716, 722 (1987); *Dambacher by Dambacher v. Mallis,* 336 Pa.Super. 22, 35–36, 485 A.2d 408, 415 (1984).

> The standard of qualification is a liberal one: "If a witness 'has any reasonable pretension to specialized knowledge on the subject under investigation he may testify, and the weight to be given to his [testimony] is for the jury: [citations omitted]....' *McCullough v. Holland Furnace Co.,* 293 Pa. 45, 49, 141 A. 631, 632 [ (1928) ]." *Moodie v. Westinghouse Electric Corp.,* 367 Pa. 493, 80 A.2d 734 (1951).

*Kuisis v. Baldwin–Lima–Hamilton Corp.,* 457 Pa. 321, 338, 319 A.2d 914, 924 (1974). See also: *Rutter v. Northeastern Beaver County School District,* 496 Pa. 590, 597–598, 437 A.2d 1198, 1201 (1981); *Vernon v. Stash,* 367 Pa.Super. 36, 51, 532 A.2d 441, 448 (1987).

█ Appellants first assert that Dr. Sturgis was not properly qualified to testify as an expert regarding state of the art because she did not qualify "as a biostatistician, a toxicologist, a mineralogist, a product labeling expert, an industrial hygienist, or, for that matter, as a physician who held herself out as having any special expertise in the area of asbestos-related diseases." However, appellants did not challenge Dr. Sturgis's qualification as an expert at trial, nor specifically assert this issue in their post-trial motions. Therefore, this issue has not been preserved for appellate review.

"It is well settled that a matter not raised in the trial court will not be considered on appeal." *Eck v. Powermatic Houdaille,* 364 Pa.Super. 178, 189, 527 A.2d 1012, 1017 (1987). To preserve an issue for appellate review, an appellant must make a timely objection at the appropriate stage of the proceedings before the trial court and must specifically raise the issue in post-trial motions. See: Pa.R. C.P. 227.1(b); *Reilly by Reilly v. Southeastern Pennsylvania Transportation Authority,* 507 Pa. 204, 214–215, 489 A.2d 1291, 1296 (1985). "The purpose for this rule is to afford the trial court the opportunity to correct an error at the time it is made, and to inform the court of the issues which must be decided at the post-trial stage ... thereby giving it the first opportunity 'to review and reconsider the determination it made at trial.'" *DiSalle v. P.G. Publishing Co.,* 375 Pa.Super. 510, 545–546, 544 A.2d 1345, 1363 (1988), quoting *Wier by Gasper v. Ciao,* 364 Pa.Super. 490, 494, 528 A.2d 616, 618 (1987). For the same reason, appellants' assertions that Dr. Sturgis's testimony should have been excluded because it "went to areas where laymen were competent to judge" and because it was based on inadmissible hearsay have also been waived. Neither of these contentions was the subject of an objection at trial nor an issue raised in appellants' post-trial motions.

Appellants' remaining objections to Dr. Sturgis's testimony have been preserved for appellate review and were discussed in the post-trial opinion of the trial court. They assert that Dr. Sturgis's testimony was immaterial, irrelevant and that certain instances of her testimony were "speculative, conjectural and prejudicial." The testimony of Dr. Sturgis was immaterial, appellants contend, because it was unrelated to any of the issues before the jury. We disagree. The jury in the instant case was presented with strict liability and negligence claims regarding appellants' failure to place any warnings on their asbestos products and their placing into the stream of commerce hazardous products. Pursuant to New Jersey law, a defendant in a products liability action based upon failure to warn is pre-

sumed to know of the dangerous character of the product and, as such, the plaintiff is not required to prove that the defendant knew or should have known of such danger. *Freund v. Cellofilm Properties, Inc.*, 87 N.J. 229, 432 A.2d 925 (1981). See: *Beshada v. Johns–Manville Products Corp.*, 90 N.J. 191, 447 A.2d 539 (1982) (in strict liability actions, culpability is irrelevant; therefore, in failure to warn cases, defendant may not present a state of the art defense and medical community's presumed unawareness of dangers of asbestos was not a defense). Although Dr. Sturgis's testimony, under these cases, was not necessary to establish plaintiffs' strict liability claim, it was nevertheless relevant thereto. It was also relevant to prove appellees' claim that appellants had acted negligently. See: *Beshada v. Johns–Manville Products Corp., supra* at 204, 447 A.2d at 546 ("state of the art is a negligence defense"). As such, the trial court cannot be said to have erred in refusing to exclude Dr. Sturgis's testimony on grounds that it was irrelevant and immaterial.

■ Appellants also assert that Dr. Sturgis's testimony was improper because her testimony was based on medical articles which had been written about asbestos exposure in other industries, e.g., textile mills and mining and manufacturing settings where workers were exposed to 100% raw asbestos fiber. According to appellants, the quantity and quality of asbestos exposure in these settings were substantially different than that present in the shipbuilding industry in which the plaintiff had worked. The trial court rejected this argument, holding that Dr. Sturgis's testimony was relevant because it pertained "to the effects of the exposure itself notwithstanding the industry in which that exposure occurred." Our review has disclosed no abuse of discretion on the trial court's part. Dr. Sturgis's testimony was offered to establish that appellants should have been aware of the dangers of exposure to asbestos at a date much earlier than they admitted knowing of such dangers. That the medical profession had identified asbestos exposure in other industries as causing injury to the workers in

those industries, therefore, was relevant to establish that appellants had reason to know of the dangers inherent in the use of asbestos.[4]

## III

■ Appellants next assert that the trial court abused its discretion by allowing the videotaped testimony of plaintiffs' expert, Dr. Robert Stiner, regarding Taylor's prognosis, because this testimony had not been included in the witness' pre-trial report, which included only a diagnosis of Taylor's injuries. Our review of the record, however, fails to disclose that the witness expressed an opinion as to Taylor's prognosis. Moreover, his testimony that in many patients "progression will occur" was harmless; for he was unable to say whether there would be such progression in Taylor's case. There was no substantial deviation between matters disclosed during discovery and the testimony of the witness at trial. See: *Trent v. Trotman*, 352 Pa.Super. 490, 502–503, 508 A.2d 580, 586–587 (1986).

■ Appellants also assert that the trial court erred when it refused to allow their own expert witness, Dr. Leonard Berkowitz, to testify concerning Taylor's history of heart disease on the ground that the witness was not a cardiologist.[5] This issue, however, was not raised in appellants' post-trial motions and, therefore, has been waived. See: *Hreha v. Benscoter*, 381 Pa.Super. 556, 564, 554 A.2d 525, 528 (1989); *O'Malley v. Peerless Petroleum, Inc.*, 283 Pa.Super. 272, 283, 423 A.2d 1251, 1257 (1980).

4. Appellants have also identified four specific instances in Dr. Sturgis's testimony where they assert the testimony was so "speculative, conjectural and prejudicial" as to require a new trial. We have reviewed each of these portions of the testimony and have found nothing therein so prejudicial as to warrant the grant of a new trial. The trial court did not abuse its discretion when it denied a new trial for these reasons.

5. Appellants also offered the expert testimony of Dr. John Helwig, who was a cardiologist, regarding Taylor's heart condition. This testimony was permitted by the trial court.

## IV

In his closing argument to the jury, plaintiffs' counsel made the following remarks:

Forty years later they first indirectly conceded that the product was hazardous. Is that the kind of corporate activity you will condone? Do you say that's what they should do? Do you say that, in an effort to maximize profits, you've got to put human beings on a level that's so far down the line it takes you 40 years to concede you hurt any?

MR. BELLO: Objection

. . . .

[Mrs. Taylor] told you that during the course of his working life, they lived right across the river there in New Jersey; and that he came home in his work clothes, which she laundered; and that these clotehs [sic] were covered with a whitish dust; and it didn't concern her in the least, because she had no reason to suspect that the dust on his clothing was a killer; that it could rob him of his life and that it could cause potential harm to those who breathed it secondarily.

In her household, where this invasion occurred, were three children—

MR. BELLO: Objection, Judge.

MR. BYRD: She told you that she was responsible for caring for the family and doing this laundering; and in that household, in addition to William Taylor, Pauline Taylor, were three children, all five of whom breathed that dust.

Do you believe that the companies were obliged to protect Mr. Taylor from that dust? Do you believe that they should have allowed him to take it home to his wife and to his kids? Do you think that these companies should escape liability for their conduct?

N.T. 12/1/86 at pp. 60–62. In response to appellants' objections to these remarks the trial court made no immediate rulings. However, on the following day, prior to the

start of the proceedings, the court sustained the first of these objections and overruled the second. Thereafter, at the conclusion of its charge to the jury, the trial court instructed the jury that:

> During closing arguments yesterday, counsel made certain remarks, counsel for the plaintiff made some indication regarding maximizing profits by the defendants.
>
> Well, let me caution you, there is no testimony in this record that the defendants were in any way maximizing any profits.

N.T. 12/2/86 at pp. 45–46.

In its post-trial opinion, the trial court concluded that its curative instruction was sufficient to alleviate any prejudice that may otherwise have resulted from counsel's remark about maximizing profits. With regard to counsel's remark about Mrs. Taylor and the plaintiffs' children having been exposed to asbestos dust, the court concluded that the remark had not been sufficiently prejudicial, in light of the court's instructions to the jury regarding the persons who were entitled to recover damages if appellants were found liable. On appeal, appellants contend that the remarks of plaintiffs' counsel were so prejudicial that the grant of a new trial is compelled. We disagree.

> Whether a lawyer's argument to the jury transgresses the bounds of legitimate advocacy is primarily for the discretion of the trial judge, and an appellate court will not interfere with the exercise of this discretion, unless the record manifests that it was clearly abused.

*Abrams v. Philadelphia Suburban Transportation Co.,* 438 Pa. 115, 119, 264 A.2d 702, 704 (1970). Moreover,

> [t]he grant of a new trial for improper remarks is within the discretion of the trial judge. *Stevenson v. Pennsylvania Sports and Enterprise, Inc.,* 372 Pa. 157, 93 A.2d 236 (1953). Further, an appellate court's "review of the grant of a new trial is limited to cases of gross abuse of discretion by the trial judge or the application of erroneous rules of law by the trial court." *Atene v. Lawrence,* 456 Pa. 541, 318 A.2d 695, 697 (1974). (Emphasis added).

*See also,* Canery v. Southeastern Pennsylvania Transportation Authority, *267 Pa.Super. 382, 406 A.2d 1093 (1979).*

Harvey v. Hassinger, 315 Pa.Super. 97, 106–107, 461 A.2d 814, 819 (1983).

■ On the record before this Court, we are unable to conclude that there was a gross abuse of the trial court's discretion in refusing to award a new trial because of remarks made by plaintiffs' counsel in his closing argument to the jury. The trial court sustained the objection to counsel's remark about maximizing profits and instructed the jury to disregard the same. As such, the grant of a new trial because of this remark was not required.

■ There was no claim made for damages to Mr. Taylor's wife and children because of their possible exposure to asbestos brought home on Taylor's clothing, and counsel's statement that appellants should not escape liability for allowing Mrs. Taylor and the Taylor children to be exposed to secondhand asbestos dust was clearly improper. In view of the trial court's instructions, however, it does not appear that counsel's remarks were so prejudicial as to require a new trial. The trial court's instructions made clear on what basis and to whom damages could be awarded and specifically informed the jury that Mrs. Taylor could be compensated only for loss of consortium. The jury, therefore, was unlikely to have concluded that it could have awarded damages because Mrs. Taylor and the children had been exposed to asbestos dust. Moreover, during the course of the trial, both Mr. and Mrs. Taylor had testified, without defense objection, that Taylor had brought asbestos dust home on his clothing. Therefore, the jury had already learned of the family's exposure to asbestos, and the comments of counsel, albeit improper, injected no facts which the jury had not already heard.

## V

■ Appellants next argue that the trial court erred when it refused to instruct the jury to apportion the damage

caused to Taylor by (1) his exposure to asbestos, (2) his smoking related emphysema, and (3) his heart disease. The trial court concluded that the evidence presented at trial was insufficient to provide the jury with any reasonable basis upon which to apportion Taylor's poor health among the various causes thereof.

Section 433A of the Restatement (Second) of Torts provides:

> § 433A. **Apportionment of Harm to Causes**
>
> (1) Damages for harm are to be apportioned among two or more causes where
>
>   (a) there are distinct harms, or
>
>   (b) there is a reasonable basis for determining the contribution of each cause to a single harm.
>
> (2) Damages for any other harm cannot be apportioned among two or more causes.

This section of the Restatement was cited by the New Jersey Superior Court in *Hill v. Macomber*, 103 N.J.Super. 127, 246 A.2d 731 (1968). There the plaintiff's automobile had been struck by another automobile and, thereafter, had again been struck by a second automobile. The driver of the second automobile argued that the jury should have been permitted to apportion the plaintiff's damages between him and the driver of the automobile which first struck the plaintiff. The New Jersey Court rejected this argument and determined that the evidence had provided no basis upon which the jury could apportion the causes of the plaintiff's harm. The Court reasoned as follows:

> Although concurrent tortfeasors generally are not jointly and severally liable where their acts caused distinct and separate injuries, or where some reasonable means of apportioning the damages is evident, the negligent driver of the automobile in the successive impact has been held jointly and severally liable for all of plaintiff's injuries, if the injuries are "indivisible" and the liability therefor cannot be allocated with reasonable certainty to the successive collisions. This has come to be known as the "single, indivisible injury" rule. For some cases in which

it was applied, see *Maddux v. Donaldson*, 362 Mich. 425, 108 N.W.2d 33, 100 A.L.R.2d 1 (Sup.Ct.1961); *Holtz v. Holder*, 101 Ariz. 247, 418 P.2d 584 (Sup.Ct.1966); *Berryman v. People's Motor Bus Co.*, 228 Mo.App. 1032, 54 S.W.2d 747 (Ct.App.1932); *Brantley v. Couch*, 383 S.W.2d 307 (Mo.Ct.App.1964).

. . . .

In these days of chain collisions, it is better that a plaintiff, injured through no fault of his own, should be compensated by both tortfeasors, even though one of them may pay more than his theoretical share of the damage which his wrong has helped to create, than that the injured party have no recovery. Our courts have seemingly favored this more modern policy. See *Ristan v. Frantzen*, 14 N.J. 455, 102 A.2d 614 (1954) and *Matthews v. Delaware*, L. & W.R.R. Co., *56 N.J.L. 34, 27 A. 919, 22 L.R.A. 261 (Sup.Ct.1893)*.

*Hill v. Macomber, supra* 103 N.J.Super. at 136–137, 246 A.2d at 736–737. See also: *Fosgate v. Corona*, 66 N.J. 268, 272, 330 A.2d 355, 358 (1974) ("[W]here the malpractice or other tortious act aggravates a preexisting disease or condition ... the burden of proof should be shifted to the culpable defendant who should be held responsible for all damages unless he can demonstrate that the damages for which he is responsible are capable of some reasonable apportionment and what those damages are.").

The parties have cited no New Jersey decisions and our own research has disclosed none which have addressed the issue of apportionment under circumstances analogous to those in the instant case. Where the law of New Jersey is unclear, we may presume it to be the same as in Pennsylvania. See: *Melville v. American Home Assurance Co.*, 584 F.2d 1306, 1308 (3d Cir.1978); *In re Trust of Pennington*, 421 Pa. 334, 340, 219 A.2d 353, 356 (1966). In *Martin v. Owens–Corning Fiberglas Corp.*, 515 Pa. 377, 528 A.2d 947 (1987), the Supreme Court of Pennsylvania applied § 433A of the Restatement and held that it had been error for a trial court to instruct the jury on apportionment where the

evidence failed to establish the existence of any reasonable basis on which to apportion the cause of the plaintiff's injuries between asbestosis and emphysema. In so holding, the *Martin* Court reasoned:

> The jury, although presented with a great deal of testimony concerning appellant's history and physical condition, was provided no guidance in determining the relative contributions of asbestos exposure and cigarette smoking to appellant's disability. In fact, two experts testified that such a determination was not possible. A situation analagous [sic] to the instant case arose in *Offensend v. Atlantic Refining Co., supra* [322 Pa. 399, 185 A. 745 (1936)]. There, a jury award of damages for aggravation of an existing tubercular condition was modified (reduced), because the expert testimony did not address the duration of the aggravation. "If the doctors were not in a position to make an estimate of the extent of the aggravation in point of time, the jury should not have been allowed to hazard a guess beyond the period shown with reasonable certainty." *Id.*, 322 Pa. at 404, 185 A. 745. Here, as in *Offensend*, the jury cannot be expected to draw conclusions which medical experts, relying on the same evidence, could not draw. The causes of disability in this case do not lend themselves to separation by lay-persons on any reasonable basis. Thus, common sense and common experience possessed by a jury do not serve as substitutes for expert guidance, and it follows that any apportionment by the jury in this case was a result of speculation and conjecture and hence, improper. "Rough approximation" is no substitute for justice.

*Id.*, 515 Pa. at 384–385, 528 A.2d at 950 (footnotes omitted).

The evidence in the instant case was that Taylor began experiencing fatigue and shortness of breath in the mid 1970s. In 1980 he was diagnosed as having asbestosis. The evidence also disclosed that Taylor had smoked a pack of cigarettes a day for approximately 30 years before quitting in the early to mid 1970s. Additionally, Taylor suffered from hypertension, arteriosclerotic heart disease,

emphysema and he had once had pneumonia. Dr. James Guidice, a specialist in pulmonary medicine, testified that Taylor, as a result of exposure to asbestos, had both pleural and parenchymal asbestosis and also pleural plaque formation or thickening in a localized area over the left diaphragm. He testified further that Taylor's asbestosis was an incurable condition, which was progressively getting worse and that the prognosis was guarded. Dr. Robert Stiner, a radiologist, testified that his review of Taylor's x-rays disclosed bilateral pulmonary interstitial scarring, bilateral pleural thickening and diaphragmatic pleural calcification and that such findings were consistent with a diagnosis of asbestosis.

Defendant/appellants presented three expert medical witnesses. Dr. Joseph Becker, a radiologist, said that upon reviewing Taylor's x-rays from 1972 until 1986 he concluded that Taylor had emphysema and some scarring of the lung from past pneumonia, but that there was no evidence of interstitial lung disease (asbestosis). Dr. Leonard Berkowitz, a pulmonary disease specialist, testified that Taylor had mild pleural thickening related to asbestos exposure and that he also had moderate obstructive lung disease of an emphysematous variety which was related to cigarette smoking. He testified further that pleural thickening generally causes no symptoms and that based upon a physical examination, pulmonary function tests and review of x-rays, he concluded that Taylor showed no signs of having asbestosis. Finally, Dr. John Helwig, a cardiologist, testified that Taylor had hypertension (high blood pressure) and arteriosclerotic heart disease, for which a triple bypass surgery had been advised. He characterized Taylor's heart condition as life threatening. The defense experts also provided testimony of a general nature that emphysema, hypertension and arteriosclerotic heart disease were all associated with the symptoms exhibited by Taylor. Dr. Helwig said also that medications taken by Mr. Taylor for his hypertension and heart condition could produce fatigue as a side effect. Based on this testimony by defense

medical experts, the defense argued to the jury that Taylor's medical problems were the result of his smoking related emphysema and heart disease rather than his exposure to asbestos.

After a careful review of the record, we are satisfied that the trial court correctly determined that the expert testimony did not provide an adequate basis to require the jury to apportion the cause of Taylor's poor health between asbestos exposure, smoking related emphysema and heart disease. It is significant that neither the experts called by plaintiffs nor the experts called by the defense attempted to apportion the cause of Taylor's illness among asbestos exposure, smoking, and heart disease. Defense experts testified that Taylor did not have asbestosis, but the jury rejected their diagnoses.

## VI

Appellants also assert that the jury's award of damages to the plaintiffs was excessive and that, therefore, the trial court erred by refusing to order a remittitur. When faced with a claim that the jury's award of damages was excessive, we must be "ever-mindful that our standard of review is extremely narrow." *Glomb v. Glomb*, 366 Pa.Super. 206, 216, 530 A.2d 1362, 1368 (1987).

> The determination of damages lies initially within the discretion of the jury, which weighs the evidence and assesses the credibility of the witnesses. *See Simmons v. Mullen*, 231 Pa.Super. 199, 331 A.2d 892 (1974). The decision to grant or to deny a new trial on the ground of excessiveness lies, in turn, within the discretion of the trial court. We will not disturb the decision absent a clear abuse of that discretion. *See Skoda v. West Penn Power Co.*, 411 Pa. 323, 191 A.2d 822 (1963); *Ammon v. Arnold Pontiac–GMC, Inc.*, 361 Pa.Super. 409, 522 A.2d 647 (1987); *Powell v. City of Philadelphia*, 311 Pa.Super. 526, 457 A.2d 1307 (1983). A verdict will stand unless its excessiveness shocks our sense of justice. *See Weed v. Kerr*, 416 Pa. 233, 205 A.2d 858 (1965); *Ammon v.*

*Arnold Pontiac–GMC, Inc., supra; Robert v. Chodoff,* 259 Pa.Super. 332, 393 A.2d 853 (1978).

*Id.,* 366 Pa.Superior Ct. at 216–217, 530 A.2d at 1368. Moreover,

> [t]he trial court has the authority to order a remittitur of excessive damages. *Ready v. Motor Sport, Inc.,* 201 Pa.Super. 528, 193 A.2d 766 (1963). However, the trial court should not interfere with functions of the jury and undertake to determine facts, which is exclusively the province of the jury. When it is apparent that the jury has returned a verdict excessive in amount and clearly beyond what the evidence warrants, the trial court should set aside or reduce the verdict. *Jones v. Stiffler,* 137 Pa.Super. 133, 8 A.2d 455 (1939). Conversely, if the verdict is supported by evidence, it must be permitted to stand where there is nothing to suggest that the jury was in any way guided by partiality, prejudice, mistake or corruption. *Stoughton v. Kinzey,* 299 Pa.Super. 499, 445 A.2d 1240 (1982). Therefore, it is the duty of the court to enforce the jury's verdict unless the circumstances cry out for judicial interference. *Prather v. H–K Corp.,* 282 Pa.Super. 556, 423 A.2d 385 (1980); *Stoughton, supra.*

*Daley v. John Wanamaker, Inc.,* 317 Pa.Super. 348, 352, 464 A.2d 355, 357–358 (1983). See: 10 Std.Pa.Prac.2d § 62:105. Compare: *Baxter v. Fairmont Food Co.,* 74 N.J. 588, 379 A.2d 225 (1977).

Instantly, the plaintiffs presented evidence that Taylor was suffering from asbestosis, a progressive and incurable disease, and that as a result thereof he had been experiencing fatigue, shortness of breath and pain or tightness in the chest at the slightest exertion. Because of his condition, Taylor was unable to participate in or enjoy the same activities as before his illness and was forced to retire from work three years before he had intended to do so. At the time of his retirement, he had been earning $23,000 per year. Additionally, there was evidence that he lived under constant fear of developing cancer in the future because of his long time exposure to asbestos in the work place. This evidence, if accepted by the jury, was sufficient to support

the jury's award of compensatory damages in the amount of $800,000 and damages for loss of consortium in the amount of $100,000. The trial court did not abuse its discretion when it refused to grant a new trial or order remittitur because of the amount of the verdict.

## VII

The final contention raised by defendant/appellants is that the trial court erred in molding the verdict. The jury responded to special interrogatories by determining that Taylor's injuries had been caused by exposure to the asbestos products of not only the five defendant/appellants, but also those of the settling defendants, the bankrupt defendants, and the Armstrong Co., a party which had not been sued.[6] Thus, the jury found that eighteen asbestos manufacturing and supplying defendants had caused Mr. Taylor's injuries, and it allocated causation for Taylor's injuries equally among the eighteen companies.

In their motion to mold the verdict, the defendant/appellants asserted that the verdict should have been molded in accordance with the jury's findings of fault, which would have fixed defendant/appellants' liability at 27.5% of the total verdict. Plaintiff/appellees, on the other hand, contended that only the causal fault of the non-settling defendant/appellants and Owens–Corning Fiberglas Co. could be included in the molding of the verdict, by virtue of its settlement agreement conceding joint tortfeasor status. See: *Griffin v. United States*, 500 F.2d 1059 (3d Cir.1974). The trial court, without explanation, concluded its post-trial opinion by stating: "[t]he verdict is molded to Five Hundred Thousand Dollars—($500,000.00)."

Our review of the relevant New Jersey authorities leads to the conclusion that the verdict should have been molded in accordance with the jury's findings of causal fault. In

6. Testimony that products made by Armstrong Co. were present at the Philadelphia Naval Shipyard was elicited from Mr. Taylor on cross-examination. Neither party has raised as an issue the propriety of the jury's allocation of a portion of the fault to a manufacturer who was not a party to the action.

*Dimogerondakis v. Dimogerondakis*, 197 N.J.Super. 518, 485 A.2d 338 (1984), the applicable law in New Jersey was discussed as follows:

Liability for damages in cases when two or more defendants were deemed causally negligent by the trier of fact was formerly apportioned pro rata in accordance with the Joint Tortfeasors Contribution Act, N.J.S.A. 2A:53A–1 et seq. The Comparative Negligence Act, N.J.S.A. 2A:15–5.1 et seq., now makes each tortfeasor liable for a percentage of the judgment equal to the percentage of negligence attributed to him by the trier of fact. This is the clear import of that portion of the Comparative Negligence Act which mandates that the jury find the percentage of negligence allocable to each party. *See* N.J.S.A. 2A:15–5.2, *Theobald v. Angelos*, 44 N.J. 228, 208 A.2d 129 (1965).

The Comparative Negligence Act applies to this trial even though the settlement reached by Surrett with plaintiff bars a claim by Antonios for contribution against Surrett. *Cf. Tefft v. Tefft*, 192 N.J.Super. 561, 471 A.2d 790 (App.Div.1983). In this situation, the jury must allocate liability between Surrett and Antonios even though Surrett, as a settling tortfeasor, cannot be affected by the jury's verdict. *Cf. Cartel Capital Corp. v. Fireco of N.J.*, 81 N.J. 548, 569, 410 A.2d 674 (1980); *Tefft v. Tefft*, 192 N.J.Super. at 565–67, 471 A.2d 790; *see also Rogers v. Spady*, 147 N.J.Super. 274, 277, 371 A.2d 285 (App.Div. 1977).

The reason for submitting the question of Surrett's negligence to the jury is that if Antonios had been found causally negligent he would have been required to pay "... the total verdict less that attributable to the settling defendants' percentage share." *Cartel Capital Corp. v. Fireco of N.J.*, 81 N.J. at 569, 410 A.2d 674. A non-settling tortfeasor against whom a verdict is rendered is entitled to an offset of an amount equal to the settling tortfeasor's proportionate share of liability. *Id.; Rogers v. Spady*, 147 N.J.Super. at 278, 371 A.2d 285. Ex-

pressed another way, a non-settling joint tortfeasor will be liable to a plaintiff only for that percentage of negligence attributable to him. Thus, even though a non-settling codefendant does not have a viable cross-claim against a settling tortfeasor, he should endeavor to prove the negligence of the settling codefendant in order to minimize the percentage of negligence for which the jury may find him responsible.

*Id.* at 521–522, 485 A.2d at 340 (footnote omitted). See also: *Cartel Capital Corp. v. Fireco of New Jersey,* 81 N.J. 548, 410 A.2d 674 (1980); *Lee's Hawaiian Islanders, Inc. v. Safety First Products, Inc.,* 195 N.J.Super. 493, 480 A.2d 927 (1984). The same principles are applicable "to fault emanating from strict product liability." *Cartel Capital Corp. v. Fireco of New Jersey, supra* at 569 n. 7, 410 A.2d at 685 n. 7; *Suter v. San Angelo Foundry & Machine Co.,* 81 N.J. 150, 406 A.2d 140 (1979).

Pursuant to the New Jersey Comparative Negligence Act, N.J.S.A. 2A:15–5.1 et seq., therefore, a non-settling defendant is "chargeable with the total verdict less that attributable to the settling defendant's percentage share." *Cartel Capital Corp. v. Fireco of New Jersey, supra* at 569, 410 A.2d at 685. The policy reasons underlying the Comparative Negligence Law have been explained as follows:

It is clear that the effect and intent of the Comparative Negligence Act were not only to accord a fairer result to moderately negligent plaintiffs but also to accord fairer justice to joint tortfeasors by calling upon them to contribute to the award in proportion to their own actual degree of negligence. That is the express mandate of N.J.S.A. 2A:15–5.3. Thus, the Comparative Negligence Act recognizes that it was as unfair for a 10% negligent tortfeasor to bear 50% of the damages as it was for a 10% negligent plaintiff to be denied any recovery at all. We also note that if achieving fairness for joint tortfeasors had not also been a purpose of the Comparative Negligence Act, there would have been no reason for it to base contribution on allocated percentages. It would have

been sufficient, had the focus been exclusively on plaintiffs, for a plaintiff's award to be reduced by the percentage of his negligence and to then require joint tortfeasors to contribute to the reduced award on a pro rata basis pursuant to the Joint Tortfeasors Contribution Law. *Lee's Hawaiian Islanders, Inc. v. Safety First Products, Inc., supra* at 505–506, 480 A.2d at 933. Cf. *Pecarsky v. Marina Associates,* 107 F.R.D. 107 (D.N.J.1985) (defendant in personal injury action permitted to file third-party complaint against unidentified party for sole purpose of enabling jury to assess percentage of fault against such party under Comparative Negligence Act); *Matthews v. Johns–Manville Corp.,* 307 Pa.Super. 300, 306, 453 A.2d 362, 365 (1982) (stay in personal injury action as to bankrupt defendants interpreted as not precluding remaining defendants from introducing evidence of bankrupt defendants' liability in their own defense).

In the instant case, Taylor and the three product identification witnesses (Caparola, Nasife and Watts), on direct and cross-examination, identified products manufactured or supplied not only by the defendant/appellants, but also defendants who had settled and who had gone into bankruptcy. The defendant/appellants, therefore, could not be held wholly responsible for causing Taylor's injuries. The jury allocated causal fault between eighteen companies, and by answer to special verdict interrogatories determined that each of the companies was equally at fault in causing Taylor's injuries. Under New Jersey law the verdict should have been molded in accordance with the jury's findings of causal fault. As such, the judgment must be modified in accordance with the jury's finding. It must be modified to reflect the jury's finding that each of the manufacturers and suppliers of asbestos products were liable for 5.5% of the total damages. Therefore, the judgment in favor of William Taylor and against the appellants will be reduced to two hundred twenty thousand ($220,000) dollars, and the judgment in favor of Pauline Taylor will be reduced to twenty-seven thousand, five hundred ($27,500) dollars.

## VIII

On October 8, 1986, the Supreme Court announced its decision in *Craig v. Magee Memorial Rehabilitation Center*, 512 Pa. 60, 515 A.2d 1350 (1986), in which it directed that "claims for delay damages are to be presented by petition within five days of a jury verdict or arbitration award." *Id.*, 512 Pa. at 65, 515 A.2d at 1353. The jury's verdict in the instant case was rendered on December 3, 1986, and, as such, the *Craig* decision was applicable. Plaintiff/appellees, however, did not file their petition for delay damages until December 12, 1986, nine days post-verdict. Because the trial court deemed this petition untimely under the directive set forth in *Craig*, it refused to award delay damages. In their cross-appeal challenging the denial of delay damages, plaintiff/appellees assert that the trial court abused its discretion in refusing to award delay damages. They assert that because procedural rules are to be liberally construed, their filing of the petition for delay damages nine days post-verdict should be deemed to be in substantial compliance with the rule announced in *Craig*. However, the Supreme Court's directive in *Craig* was clear. Therefore, the trial court cannot be deemed to have erred or abused its discretion by following the law as announced by the Commonwealth's highest tribunal.

The judgment in favor of William Taylor and against the appellant defendants is reduced to two hundred twenty thousand ($220,000) dollars, and the judgment in favor of Pauline Taylor is reduced to twenty-seven thousand, five hundred ($27,500) dollars. As so reduced, the judgment is affirmed.