444 A.2d 85

Marnee B. McCLINTON, Administratrix of the Estate of Robert B. McClinton, Deceased, and Harry Toney, Administrator of the Estate of Dino Toney, Deceased, Appellants

v.

Barbara WHITE, Administratrix of the Estate of James C. McClinton, Jr., Deceased, and Lee C. Smith

Supreme Court of Pennsylvania.

Argued March 2, 1982.

Decided April 21, 1982.

John A. Miller, Petrush & Miller, Beaver Falls, for Marnee B. McClinton.

Frank C. Lewis, Hudacsek & Lewis, Beaver Falls, for Harry Toney.

Samuel C. Holland, Panner, Holland & Autenreith, Beaver, for Barbara White, etc.

Edward J. Tocci, Aliquippa, for Lee C. Smith.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, FLAHERTY, McDERMOTT and HUTCHINSON, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

This is a survival action. The sole issue is whether the trial court properly instructed the jury on the "personal maintenance" deduction. A panel of the Superior Court was of the view that a new trial is necessary because the instruction unduly limited the scope of items includible within the deduction to "subsistence level expenses." We hold that on the present record the court's charge does not require a new trial. Hence we vacate the order of the Superior Court, 285 Pa.Super. 271, 427 A.2d 218, and remand for further proceedings.

I

Appellants' decedents Robert McClinton (age 16) and Dino Toney (age 18) were passengers in a vehicle being driven by appellee's decedent James McClinton. The vehicle struck another vehicle being driven by Lee Smith. Smith survived the accident, but all of the others were killed instantly. Appellants commenced the present action against appellee and Smith. In the liability phase of trial, a jury held only appellee liable.

In the phase of the trial relating to damages, appellants sought recovery for the lost earnings of the decedents. After presenting evidence on the interests, talents, and ambitions of their decedents, appellants presented the testimony of Dr. Reuben Slesinger, Professor of Economics at the University of Pittsburgh. Utilizing statistics on average incomes complied by the United States Department of Commerce and tables on work-life expectancies compiled by the United States Department of Labor, Dr. Slesinger calculated the decedents' earning potential both as college graduates and as high school graduates.

From the gross earning potential of the decedents Dr. Slesinger subtracted 35% of the computed sums to reflect a deduction for his estimates of "personal maintenance." This deduction was based on the assumption that both of the decedents would marry and become members of a four-person "model" family. The 35% figure, derived from United States Department of Labor statistics, reflected the individual share of the model family's budget of a person under thirty-five years of age. Dr. Slesinger applied the 35% figure to all years of the decedent's work-life expectancy. Personal maintenance included expenditures for "food, clothing, things of this type." [1]

Dr. Slesinger subtracted an additional 3.5% of decedents' gross earning potential to reflect "personal absences." This deduction was based on a recently released study which had concluded that "people throughout a work year tend to take off about nine days, . . . or about three-and-a-half percent of their work year . . . ." According to Dr. Slesinger,

"[t]his is not your vacation where you are paid. It is not sickness where you are paid. It is just you don't show up for work. Maybe they want to go hunting, or maybe they just don't feel like going to work that day. Now, that three-and-a-half percent is a deduction of earnings, and really it does not affect your earning power. The earning

1. Record at 140a.

power is there, and the fact that you take off a few days does not affect earning power. But, in order to be a little more conservative, I did deduct it anyway." [2]

After making this deduction, Dr. Slesinger reduced the net earning potential to present worth.[3]

Dr. Slesinger's analysis yielded the following estimates:

| | McCLINTON (age 16) | | TONEY (age 18) | |
| | College | High School | College | High School |
| --- | --- | --- | --- | --- |
| Gross Earning Potential | $772,242 | $551,709 | $772,242 | $543,394 |
| Less: | | | | |
| Personal Maintenance (35% of Gross) | (270,285) | (193,099) | (270,285) | (190,188) |
| Personal Absences (3.5% of Gross) | (27,029) | (19,310) | (27,029) | (19,019) |
| Net Earning Potential | $474,928 | $339,300 | $474,928 | $334,187 |
| Present Worth (at 6%) | $211,962 | $159,842 | $218,383 | $159,967.[4] |

Although appellee cross-examined Dr. Slesinger on the assumptions underlying his methodology, appellee offered no evidence to dispute the reasonableness of Dr. Slesinger's deductions from gross earning potential.

In its charge to the jury, the court directed the jury to deduct from each decedent's gross earning potential "the probable cost of his necessary, economic living expenses and personal maintenance, those expenses required to sustain his

**2.** Record at 141a.

**3.** Trial was held before this Court's decision in *Kaczkowski v. Bolubasz*, 491 Pa. 561, 421 A.2d 1027 (1980) (courts "instructed to abandon the practice of discounting lost future earnings").

**4.** The net earning potential of the decedents is the same where it is assumed that both would have completed college. However, the present worth of Toney's net earning potential is larger than McClinton's because Toney would have completed college (and hence entered the job market) before McClinton. The difference in gross earning potential where it is assumed that both would have completed high school only is attributable to the differences in the decedents' ages and work-life expectancies.

life until the day of his retirement ...."[5] In defining "probable cost of maintenance," the court stated:

"[Personal maintenance] is that figure or that amount of money that you estimate or determine he would have spent on himself individually, personally, not what he might have spent on a wife, not what he might have spent on children, not what he might have spent on parents or relatives or friends, not what he might have given away as gifts, but what he would have spent to provide himself with the necessities of life; that is, what he would have spent to sustain his life, to subsist and to live on. In other words, what he would have spent for those things which are essential to the individual's personal and physical subsistence. That cost, of course, what that cost or personal maintenance would be is for you to judge and for you to determine on the basis of the evidence you have heard and exercising and using your combined life's experience and combining and pooling your common sense, and applying those matters to the evidence and testimony and deciding what each of these young men, in all probability or more likely than not, would have spent for their own personal or individual maintenance."[6]

Appellee unsuccessfully objected to the charge on the theory that "personal maintenance" includes "the amount which the person spends on [himself]," and not merely expenditures "for essentials or necessities only." The jury returned identical verdicts of $170,000 in favor of each of the appellants. These amounts were less than those calculated by Dr. Slesinger on the assumption that decedents would have graduated from college, but more than those calculated on the assumption of their graduation from high school only.

## II

■ Although offered as a definition of "personal maintenance," appellee's proposed modification of the court's charge to require a deduction for "the amount which the

5. Record at 229a.

6. Record at 230–31a.

person spends on [himself]" would have limited appellants' recovery to the difference between decedents' gross earnings and their total personal expenditures. This difference, termed "net accumulations,"[7] understates the proper measure of lost earnings under the law of this Commonwealth. As this Court observed four decades ago,

> "[a]s to the ... viewpoint ... that the amount recoverable should have been limited to the probable *accumulations* by the deceased during his life expectancy—that is to say, to the present worth of what he would probably have left at the end of his life to his creditors, legatees and heirs—this would introduce into the law of damages elements never heretofore recognized in Pennsylvania ...."

*Pezzulli v. D'Ambrosia*, 344 Pa. 643, 649, 26 A.2d 659, 662 (1942). Accordingly, appellee's proposed modification of the charge was properly rejected by the trial court.[8]

■ Although the panel of the Superior Court rejected appellee's view that the trial court had erred in refusing to charge that appellants could recover only their decedents' net accumulations, it did accept appellee's contention that the charge was "overly restrictive" and "provided the jury with an incorrect standard for determining damages." According to the Superior Court, "[c]learly, the trial court's description of the maintenance expense deduction in terms of physical subsistence was error." In setting forth its view of the expenses that should be included in the deduction, the Superior Court chose to view the decedent "as an economic

7. See Martin, "Measuring Damages in Survival Actions for Tortious Death," 47 Wash.L.Rev. 609, 620 (1972).

8. We recognize that, in rejecting the accumulations standard, *Pezzulli* stated that there should be no deduction from gross earnings. However, this statement was dictum, as the plaintiff had expressed satisfaction with the trial court's charge directing the jury to deduct the cost of maintenance from gross earnings. 344 Pa. at 646 & 649, 26 A.2d at 660 & 662. In any event, the dictum in *Pezzulli* was repudiated by this Court in *Murray v. Philadelphia Transportation Co.*, 359 Pa. 69, 58 A.2d 323 (1948), where the "cost of maintenance" deduction was approved. See also *Incollingo v. Ewing*, 444 Pa. 299, 282 A.2d 206 (1971).

unit capable of producing earnings, but subject to the costs of production." As examples of "typical" production costs, the Superior Court cited with approval the analysis of the term "cost of maintenance" contained in Bernstein, "Damages in Personal Injury and Death Cases in Pennsylvania (A Supplement)," 26 Pa.Bar.Ass'n Q. 26 (1954).

We do not disagree with the Superior Court's economic-unit analysis, or its approval of the analysis of "cost of maintenance" set forth by Mr. Bernstein. Under the latter analysis, cost of maintenance is

> "that *necessary and economical* sum which a decedent would be expected to spend, based upon his station in life, for food, clothing, shelter, medical attention and some recreation."

Bernstein, supra, at 34 (footnote omitted). We emphasize only that, for the sake both of clarity and the parties' presentation of proof, a jury should be charged in specific, readily understandable terms such as those just quoted. We do, however, disagree with the conclusion of the Superior Court that the trial court's charge requires a new trial.

The trial court's use of the phrases "to sustain . . . life," "to subsist [on]," and "subsistence" may not have been the most ideal manner of expressing the deduction for maintenance required by our case law. See *Incollingo v. Ewing*, 444 Pa. 299, 282 A.2d 206 (1971), and *Murray v. Philadelphia Transportation Co.*, 359 Pa. 69, 58 A.2d 323 (1948). Viewed in isolation, these terms are capable of conveying the impression that the deduction encompasses only those expenditures essential to the barest survival. In disregard of the mandate of our case law, a deduction limited to expenditures for the barest survival would, in reality, approach no deduction at all.

Here, however, appellants' own expert witness specifically deducted two sums from the decedents' gross earning potential: "personal maintenance" and "personal absences." Although the expert witness's formulation of the first deduction for "personal maintenance" was limited to reasonable expenditures for food, clothing, and "things of this type,"

the second deduction for "personal absences" was described to take into account such likely factors as the decedent's desire "to go hunting" or his lack of desire to "[go] to work that day." Appellee offered no evidence to refute the propriety of the scope of either of these deductions.

The first deduction for "food, clothing, things of this type" reflected a significant range of expenditures for maintenance. The leisure activities contemplated by the second deduction for personal absences also make positive contributions to maintenance. Earnings which are forgone for the sake of such days are as much expenditures for leisure activities as are monies directly spent on the same activities.

Despite the potential for misimpression inherent in the phrases employed by the trial court, the expert's deductions for "personal maintenance" and "personal absences" rendered the likelihood of misimpression negligible. When instructed by the court to subtract from gross earning potential those sums that the decedent "would have spent to sustain his life, to subsist and to live on," or, as the court also stated, "those things which are essential to the individual's personal and physical subsistence," this jury was directed to consider all items included in the expert's deductions. As "food, clothing, things of this type," and leisure activities properly reflect the items of expense within the maintenance deduction, see Bernstein, supra, we conclude that the court's charge provided a proper guiding compass for the evaluation of the evidence on the maintenance deduction. Hence, the Superior Court incorrectly deemed the court's charge reversible error.

The record indicates that, in view of its disposition, the Superior Court had no occasion to pass upon other assignments of error which had been presented by appellee. These other assignments are not now before us. Thus, fair and effective appellate review requires the vacation of the order of the Superior Court and a remand of the record to that court for disposition of appellee's remaining assignments of error.

Order of the Superior Court vacated and case remanded.