J. A11005/15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

NORTH EAST EDUCATIONAL : IN THE SUPERIOR COURT OF
ASSOCIATES, INC., D/B/A : PENNSYLVANIA
BRIDGEWAY ACADEMY, :
:
                    Appellant :
:
          v. :
: No. 1182 EDA 2014
KILLER INTERACTIVE, LLC, AND :
JASON PIJUT :


Appeal from the Judgment Entered June 18, 2014,
in the Court of Common Pleas of Northhampton County
Civil Division at No. C48-CV2013-3583


BEFORE: FORD ELLIOTT, P.J.E., OLSON AND WECHT, JJ.


MEMORANDUM BY FORD ELLIOTT, P.J.E.: **FILED JUNE 03, 2015**

Appellant brings this appeal from the judgment entered June 18, 2014, which found in favor of appellees regarding appellant's lawsuit against appellees which sounded in breach of contract, fraud, unjust enrichment, and which sought to pierce the corporate veil. Appellees were also partially victorious on a counterclaim. Finding no error below, we affirm.

Appellant, North East Educational Associates, Inc., doing business as Bridgeway Academy ("Bridgeway"), is a company that markets programs and support to parents who wish to home school their children. Jessica Parnell ("Parnell") is the president of North East Educational Associates, Inc. Killer Interactive, LLC ("Killer"), is a company that creates

custom software and internet websites. Jason Pijut ("Pijut") is the chief operating officer of Killer.

On November 8, 2011, Bridgeway and Killer entered into a written contract for Killer to design a custom internet website for Bridgeway. The work was to be completed in six phases with the following completion dates: Phase 1 -- January 1, 2012; Phase 2 -- April 2, 2012;[1] Phase 3 -- April 20, 2012; Phase 4 -- April 20, 2012; Phase 5 -- August 1, 2012; and Phase 6 -- September 21, 2012. Moreover, the parties viewed the completion of Phase 2, the customer relationship management software, as the most crucial piece of the new system.

The written contract also contained the following termination terms:

> Termination can occur at any point during the project. The CLIENT reserves the right to terminate this Agreement upon thirty (30) days written notice to Killer for any cause. Killer shall, at its option, have the right to terminate this agreement with retention of all fees paid as of the date of termination, in the event that CLIENT breaches any of its obligations under this agreement.
>
> In the event of any termination or cancellation of this agreement by CLIENT, CLIENT shall be liable to Killer for only the pro rata portion of the fee, at the discretion of Killer up to a $1,000.00 cancellation fee and expenses set forth in this Agreement.

Agreement, Termination Clause.

---

[1] Appellant's brief states April 20, 2012, as the completion date for Phase 2. (Appellant's brief at 12.) However, the agreement itself bears the date we use.

Finally, the contract obligated Bridgeway to make an initial payment of $8,600 to Killer, followed by nine additional monthly payments of $8,600, for a total payment of $86,000. (Agreement, Payment Schedule and Timeline Clause.)

At trial, the parties were in dispute as to Killer's performance under the contract. According to Pijut, the website was live but had simply not been activated, while Parnell testified that none of the six phases had been completed. (Notes of testimony, 3/11/14 at 26-27, 72-74, 79; 130-131.)[2] What the parties apparently did agree upon is the misrepresentation of Killer employee Jonathan Koray Girton ("Girton") to Bridgeway.

Girton was Killer's primary project developer for the Bridgeway project. (*Id.* at 36, 248.) Indeed, it was Girton who initially "sold" Parnell on hiring Killer, because Girton had "the vision." (*Id.* at 125.) Ultimately, Pijut discovered that Girton had fallen badly behind in the development of the Bridgeway project, especially in regard to the critical Phase 2. (*Id.* at 79-80.) Pijut also discovered that Girton had actually created a sham search engine program as part of Phase 2 in order to deceive Parnell and Bridgeway as to his progress. (*Id.* at 227-228, 236, 261-262.) As a result, Pijut fired Girton on June 19, 2012. (*Id.* at 250.)

---

[2] Pijut specifically testified that the critical Phase 2 customer relationship management software had been installed, but had not yet been made available to Bridgeway. (*Id.* at 79.)

Pijut claimed that he informed Parnell of Girton's deception during a telephone conversation at that time. (*Id.* at 77.) Pijut also stated that he had a sit-down meeting with Parnell and Bridgeway on June 20, 2012, where he again informed them about Girton's deception including his fabrication of the fake search engine. (*Id.* at 82, 226-228, 236.) At the time, Pijut informed Parnell and Bridgeway that he believed that Killer could still meet its obligations, stating that they "should be on target or very close on the rest of the phases." (*Id.* at 81.) However, when Pijut and his other employees subsequently reviewed Girton's computer code, they discovered that it was going to take more time and effort to fix than they had first thought. (*Id.* at 82, 237.)

For her part, Parnell denied that she was informed in June as to Girton's deception. (*Id.* at 128.) Rather, she claimed that the deception did not come to her knowledge until November 2012. (*Id.* at 128-129.) On or about November 30, 2012, Bridgeway informed Killer that they were done making payments on the contract. (*Id.* at 130.) Bridgeway had, in fact, not made a payment to Killer since May 2012. (*Id.* at 146.) Sometime in mid-December of 2012, Bridgeway told Killer that they were no longer to work on the project. (*Id.* at 66.) Finally, Parnell admitted that after Girton was fired from Killer, she hired him to create a warehouse management system that would "talk the same language" as the system Killer was creating under Phase 2. (*Id.* at 146-147.)

Bridgeway filed its Complaint on April 18, 2013. As noted, it sounded in breach of contract, fraud, unjust enrichment, and sought to pierce the corporate veil in order to hold Pijut personally liable. Killer and Pijut filed their Answer, New Matter, and Counterclaim on May 30, 2013. The Counterclaim sought the $22,650 that was still owing on the contract, plus compensation for additional work that had been performed, and the $1,000 wrongful cancellation charge described in the termination clause. Both sides also sought counsel fees.

Following a bench trial on March 11, 2014, the trial court rendered its decision on March 13, 2014. The court found in favor of Killer on all counts of both the Complaint and the Counterclaim except that count of the Counterclaim seeking the $22,650 that Killer claimed was still owing. The court found that Killer was owed $60,586 for the contract work performed, $2,000 for additional work, and $1,000 for the wrongful termination charge, for a total of $63,586. The court further found that Bridgeway had overpaid this amount, having made payments to Killer totaling $66,500. Therefore, the court awarded Bridgeway the difference between the sums, $2,914. No counsel fees were awarded. Following post-trial motions, Bridgeway filed this timely appeal.

On appeal, Bridgeway raises the following issues:

> A. Did the lower court err in asserting that it was compelled to enforce specific terms of the written contract against the Plaintiff when, as a matter of law, Defendants admitted fraudulent

misrepresentations to Plaintiff voided the terms of the contract which the lower court construed against Plaintiff?

B.    Did the lower court err in denying the Plaintiffs' claim for damages arising from Defendants' material breach of the contract and/or from Defendants' unjust enrichment when the lower court conceded and/or the evidence adduced at trial demonstrated (a) Plaintiff paid $66,500.00 to Defendants on a contract for the installation of a software system, (b) that Defendants failed to install the software system pursuant to the contract, and (c) that Defendants' failure to install the software system was the result of Defendants' wrongful and intentional conduct?

C.    Did the lower court err in failing to pierce the corporate veil despite (a) Defendants' admissions that the corporation was severely undercapitalized, (b) Defendants' admission that Jason Pijut comingled his personal funds and debts with those of the LLC, and (c) The fact that the Defendants were involved in the perpetration of a fraud?

Bridgeway brief at 7.

We begin our analysis with our standard of review:

Our review in a non-jury case is limited to whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in the application of law. We must grant the court's findings of fact the same weight and effect as the verdict of a jury and, accordingly, may disturb the non-jury verdict only if the court's findings are unsupported by competent evidence or the court committed legal error that affected the outcome of the trial. It is not the role of an appellate court to pass on the credibility of witnesses; hence we will not substitute our judgment for that of the fact[-]finder. Thus, the test we apply

is not whether we would have reached the same result on the evidence presented, but rather, after due consideration of the evidence which the trial court found credible, whether the trial court could have reasonably reached its conclusion.

*Agostinelli v. Edwards*, 98 A.3d 695, 704 (Pa.Super. 2014), *appeal denied*, ___ A.3d ___, (Pa. Apr 01, 2015) (NO. 698 MAL 2014), quoting *Lynn v. Pleasant Valley Country Club*, 54 A.3d 915, 919 (Pa.Super. 2012).

Bridgeway first complains that the trial court erred in enforcing the obligations of the contract because the contract was rendered void by Girton's misrepresentation.

> In order to void a contract due to a fraudulent misrepresentation, the party alleging fraud must prove, by clear and convincing evidence: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) resulting injury proximately caused by the reliance. *Bortz v. Noon*, 556 Pa. 489, 499, 729 A.2d 555, 560 (1999); *Gibbs v. Ernst*, 538 Pa. 193, 207, 647 A.2d 882, 889 (1994). All of these elements must be present to warrant the extreme sanction of voiding the contract.

*Porreco v. Porreco*, 811 A.2d 566, 570-571 (Pa. 2002).

Bridgeway cannot void the contract because no injury was caused by reliance on Girton's misrepresentation. The trial court specifically found the testimony of Pijut to be credible as to alerting Bridgeway to Girton's

misrepresentation in June of 2012. (Pa.R.A.P. 1925(a) STATEMENT, 11/10/14 at 4-5.) Thereafter, Bridgeway did not immediately give 30 days' notice that it desired to terminate the contract; rather, Bridgeway apparently acceded to Killer's entreaties to allow their relationship to continue and that Killer would attempt to meet its contractual obligations. Thus, Bridgeway did not rely on Girton's misrepresentation, but chose to proceed with full knowledge of it. Moreover, the injury here is a delay in completion of the contract on schedule. By going forward after it had been advised of Girton's misrepresentation, Bridgeway accepted the delay caused by Girton. In sum, the contract here is not voidable because of any reliance on Girton's misrepresentation.

In its next issue, Bridgeway argues that the trial court's decision is absurd, because it "paid [Killer] $66,500, but received nothing of any value as a result of fraudulent conduct of Mr. Girton,"[3] that "[t]here is no doubt that none of the six proposed phases of the System are accessible and operational,"[4] and that it is egregiously absurd that Bridgeway is being forced to pay Killer for any work done by Girton. This argument is essentially that the verdict is against the weight of the evidence.

> [a]ppellate review of a weight
> claim is a review of the [trial court's]
> exercise of discretion, not of the
> underlying question of whether the

---

[3] Bridgeway brief at 36.

[4] Bridgeway brief at 37.

> verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.
>
> Accordingly, there is a general rule barring appellate review of weight claims in the first instance. As such, where an appellant fails to raise a weight claim before the trial court, thus preventing it from addressing the claim from the vantage point of having presided over the trial, the claim is unreviewable on appeal.

*Phillips v. Lock*, 86 A.3d 906, 919 (Pa.Super. 2014), quoting *In re Estate of Smaling*, 80 A.3d 485, 490-491 (Pa.Super. 2013) (*en banc*) (citations omitted).

Bridgeway did not raise a weight of the evidence claim in its motion for post-trial relief but only addressed the issue of fraud and the voidability of the contract. The trial court did not review the weight of the evidence and there is nothing for us to review. The failure to include a weight of the evidence claim in a post-trial motion waives the claim. *Bensinger v. University of Pittsburgh Medical Center*, 98 A.3d 672, 685 (Pa.Super. 2014).

We note that the trial court regarded this issue not as a weight of the evidence claim, but as a challenge to its determination of damages (Pa.R.A.P. 1925(a) STATEMENT, 11/10/14 at 5.) To the extent that Bridgeway's argument presents a question of whether the evidence supports the damages awarded, we reiterate the following standard of review:

> If a verdict bears a reasonable resemblance to the proven damages, this Court will not substitute its assessment for that of the trier of fact. **Reimer v. Tien**, 356 Pa.Super. 192, 514 A.2d 566 (1986). Our standard of review is extremely narrow. **Taylor v. Celotex**, 393 Pa.Super. 566, 593, 574 A.2d 1084, 1098 (1990). An order for remittitur is only justified if the verdict is unsupported by the evidence or was the product of "partiality, prejudice, mistake or corruption." [**Rafter v. Raymark Industries, Inc.**, 429 Pa.Super. 360, 371, 632 A.2d 897, 902 (1993)].

**Barrack v. Kolea**, 651 A.2d 149, 156 (Pa.Super. 1994), **appeal denied**, 668 A.2d 1134 (Pa. 1995).

Bridgeway's claims that it paid Killer $66,500, but received nothing of any value and that none of the six proposed phases were accessible and operational relies wholly on Bridgeway testimony. The testimony presented on behalf of Killer readily supports that it had implemented much of the necessary computer code, but that the code had simply not been activated yet:

> Q. Do you recall your testimony earlier?
>
> A. Yes.
>
> Q. Do you recall your testimony about the website?

A. Yes.

Q. And you conceded, did you not, that the website is not accessible from the World Wide Web at this point, correct?

A. I know it was accessible is what I said. I said it wasn't -- it wasn't accessible through a dot com. It was accessible through an IP address.

Q. All right. But you can't type in Bridgeway Academy into Google and get that website, correct?

A. No. The main -- like I said, I can explain it if --

Q. Is that correct? Is that correct? You can't -- if you type in Bridgeway Academy --

A. Sure. You -- the main -- the dot com was never appointed to that IP address.

Q. Okay. So just for everyone's understanding, if you type in Google like I do, Bridgeway Academy, a website comes up, but it's not the website -- it's not this website?

A. No. They opted never to put it live.

Q. All right. For reasons that were discussed at a previous exhibit where they said there were problems?

A. For his -- yeah. For his breakdown of the search issues that he believed he was going to have.

Q. So -- and certainly [Phase 2] was never complete, correct?

A. The Family File Section of [Phase 2] was completed where family files can be corrected

> and indexed and cross-referenced and searched and all those pieces. All that was completed.

> Q. [Phase 2] as outlined in the proposal is not complete, correct?

> A. The full phase of it, no, was not completed.

Notes of testimony, 3/11/14 at 73-75 (cross-examination of Pijut).

This testimony clearly indicates that Killer completed parts of the computer code, including parts of Phase 2, albeit not all of the project. The trial court credited Killer's efforts with a value of $60,586.25 on a contract bearing a total value of $86,000. (Pa.R.A.P. 1925(a) STATEMENT, 11/10/14 at 5.)[5] Killer was plainly not accorded the value of the completed project. The trial court based its finding, in part, on trial exhibit number 27, which was a report of Killer's billable hours to date. *Id.* We find that the evidence supported the ultimate award to Bridgeway, and we find no error in the trial court's assessment.

In its final issue, Bridgeway contends that the trial court erred in failing to pierce the corporate veil in order to hold Pijut personally liable.

> [T]here is a strong presumption in Pennsylvania against piercing the corporate veil. ***Wedner v. Unemployment Board***, 449 Pa. 460, 464, 296 A.2d 792, 794 (1972) ("[A]ny court must start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an

---

[5] The final award ignored the extra 25 cents accorded to Killer.

exception. . . . Care should be taken on all occasions to avoid making the entire theory of corporate entity * * * useless. *Zubik v. Zubik*, 384 F.2d 267, 273 (3d Cir.1967)"). Also the general rule is that a corporation shall be regarded as an independent entity even if its stock is owned entirely by one person. *College Watercolor Group, Inc. v. William H. Newbauer, Inc.*, 468 Pa. 103, 117, 360 A.2d 200, 207 (1976).

Commonwealth Court has set out the factors to be considered in disregarding the corporate form as follows:

> undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs and use of the corporate form to perpetuate a fraud. *Department of Environmental Resources v. Peggs Run Coal Co*[.], [423 A.2d 765 (Pa.Cmwlth.1980)].

*Kaites v. Dept. of Environmental Resources*, [529 A.2d 1148, 1151 (Pa.Cmwlth.1987)]. *See also Watercolor Group v. Newbauer*, 468 Pa. at 117, 360 A.2d at 207, (corporate veil may be pierced whenever one in control of a corporation uses that control or corporate assets to further his personal interests).

*Lumax Industries, Inc. v. Aultman*, 543 Pa. 38, 41-42, 669 A.2d 893, 895 (1995). "Nevertheless, 'a court will not hesitate to treat as identical the corporation and the individuals owning all its stocks and assets whenever justice and public policy demand and when the rights of innocent parties are

> not prejudiced thereby nor the theory of corporate entity made useless.'" ***Good v. Holstein***, 787 A.2d 426, 430 (Pa.Super.2001) (quoting ***Kellytown Co. v. Williams***, 284 Pa.Super. 613, 426 A.2d 663, 668 (1981)). Stated differently, "'[T]he corporate form will be disregarded only when the entity is used to defeat public convenience, justify wrong, protect fraud or defend crime.'" ***Good***, 787 A.2d at 430 (quoting ***First Realvest, Inc. v. Avery Builders, Inc.***, 410 Pa.Super. 572, 600 A.2d 601, 604 (1991)).

***Advanced Telephone Systems, Inc. v. Com-Net Professional Mobile Radio, LLC***, 846 A.2d 1264, 1277-1278 (Pa.Super. 2004) (footnote omitted), ***appeal denied***, 859 A.2d 767 (Pa. 2004).

We find no basis for piercing the corporate veil. Bridgeway did adduce testimony that Pijut made personal withdrawals on the Killer corporate bank account, but as Killer and Pijut indicate, the amounts were not significant enough, compared to Killer's gross receipts, to merit piercing the corporate veil. Bridgeway also argues that Killer was undercapitalized because there were no funds to pay a subcontractor Killer hired to work on the Bridgeway project.[6] However, Pijut testified that he was relying on future payments from Bridgeway as well as other incoming funds to pay the subcontractor. (Notes of testimony, 3/11/14 at 113.) Finally, the use of the corporate form here was not instrumental to the fraud that was alleged. Simply stated, this is not an example of the grievous misuse of the corporate form required to pierce the corporate veil. Given the strong presumption in Pennsylvania

---

[6]Reenhanced, LLC.

against piercing the corporate veil, we must affirm the trial court's decision not to do so.

Accordingly, having found no merit in the issues on appeal, we will affirm the judgment entered below.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/3/2015